Filed: 6/17/2019 1:22 PM
Clerk
Marion County, Indiana

| | | |
|---|---|---|
| **STATE OF INDIANA** | ) | **IN THE MARION COUNTY COURTS** |
| | ) SS: | |
| **COUNTY OF MARION** | ) | **CAUSE NO. 49D01-1906-CT-023475** |
| | ) | |
| MELISSA R. LITTLE and | ) | |
| JOHN M. LITTLE, JR., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| COLOPLAST CORP.,COLOPLAST | ) | |
| MANUFACTURING US LLC, BOSTON | ) | |
| SCIENTIFIC CORPORATION, | ) | |
| MICHAEL H. HEIT, M.D. | ) | |
| | ) | |
| Defendants. | ) | |

## FIRST AMENDED COMPLAINT

COMES NOW the Plaintiffs, Melissa Little ("Melissa"), and John M. Little, Jr., by

undersigned counsel, and files this Complaint against Defendants, Coloplast Corp., Coloplast

Manufacturing US LLC, Boston Scientific Corporation ("BSC"), and Michael H. Heit, M.D., and

alleges as follows:

## THE PARTIES

1.      Melissa is a citizen and resident of the City of Delphi, County of Carroll, State of Indiana.

2.      Defendant Coloplast Corp. ("Coloplast Corp.") is a corporation organized and existing

under the laws of the State of Delaware, maintaining its principal place of business at 1601 West

River Road North, Minneapolis, Minnesota 55411. Coloplast Corp. is a wholly-owned U.S. sales

and marketing subsidiary of Coloplast A/S, a Denmark corporation.   The registered agent for

Coloplast Corp. is CT Corporation System, 150 West Market Street, Suite 800, Indianapolis,

Indiana.

1



3.      Defendant Coloplast Manufacturing US, LLC is a limited liability corporation organized and existing under Delaware law, maintaining its principal place of business as 1940 Commerce Drive, North Mankato, MN 56002. Its registered office is 560 Park Street, #6, St. Paul, Minnesota 55103. Coloplast Manufacturing US, LLC is a wholly-owned subsidiary of Coloplast Corp. (Coloplast Corp. and Coloplast Manufacturing US, LLC collectively referred to as "Coloplast.")

4.      BSC is a Delaware corporation with its corporate headquarters in Massachusetts. All acts and omissions of Boston Scientific as described herein were done by its agents, servants, employees and/or owners, acting in the course and scope of their respective agencies, services, employments and/or ownership. The registered agent for Boston Scientific is Corporation Service Company, 135 North Pennsylvania Street, Suite 1610, Indianapolis, Indiana 46204.

5.      Coloplast was engaged in the business of placing medical devices into the stream of commerce by designing, manufacturing, testing, training, marketing, promoting, packaging, labeling, and/or selling such devices, including the Restorelle.   BSC was engaged in the business of placing medical devices into the stream of commerce by designing, manufacturing, testing, training, marketing, promoting, packaging, labeling, and/or selling such devices, including the Advantage.

6.      At all relevant times herein, Michael H. Heit, M.D. (sometimes hereinafter referred to as "implanting physician")     was a health care provider as defined by the Indiana Medical Malpractice Act (the "Act"), Ind. Code §34-18-1, et seq., and licensed to practice medicine in the State of Indiana with his practice of medicine located in Indiana.   This case is brought under Ind. Code. §34-18-8-6 in that Plaintiff seeks damages in an amount less than $15,000.00.

## JURISDICTION AND VENUE

7.      At all relevant times, Coloplast sold its Restorelle mesh and BSC its Advantage sling,

either directly or indirectly, to members of the general public (including Melissa),   physicians,

and hospitals within the State of Indiana.

8.      In or around June 2017, Michael H. Heit, M.D., at Indiana University Health, IUH

Methodist Hospital ("IUH"), in City of Indianapolis, County of Marion,   State of Indiana,

implanted Melissa with defective   mesh products: a BSC Advantage mid-urethral sling for stress

urinary incontinence; and a Coloplast Restorelle for prolapse of vaginal vault after hysterectomy,

vaginal enterocele, cystocele,, and rectocele.   These two products hereinafter sometimes referred

to as "Pelvic Mesh Products."

9.      As a direct and proximate result of the Coloplast and BSC selling their Pelvic Mesh

Products for implant in women, Melissa   suffered and continues to suffer injury and damage,

including, but not limited to, past, present, and future physical and mental pain and suffering,

emotional distress, her ability to function as a whole person, aggravation of preexisting injury or

condition, disfigurement, and past, present, and future medical, hospital, monitoring,

rehabilitative, and pharmaceutical expenses, and lost income and earning capacity.

10.     At all relevant times, Coloplast and BSC were present and transacted, solicited, and were

doing business in the State of Indiana through their employees, agents, representatives, and

derived substantial revenue from such business.

11.     At all relevant times, Coloplast and BSC expected or should have expected that their acts

and omissions would have consequences to patients within United States and the State of Indiana.

## FACTUAL BACKGROUND

12.     The Restorelle product manufactured by Coloplast and the Advantage product manufactured by BSC, at all relevant times, were Class II medical devices.

13.     Restorelle was designed primarily for pelvic organ prolapse ("POP").   Advantage was designed primarily for stress urinary incontinence ("SUI").   The Defendants Coloplast and BSC designed, patented, manufactured, packaged, labeled, marketed, sold, and distributed these Pelvic Mesh Products. Each of these products was cleared for sale in the United States after the Defendants Coloplast and BSC made assertions to the Food and Drug Administration of "Substantial Equivalence" under Section 510(k) of the Food, Drug and Cosmetic Act; this clearance process does not require the applicant to prove safety or efficacy. One or more of their Pelvic Mesh Products were implanted in Melissa as alleged above.

14.     Surgical mesh products have been used to repair abdominal hernias since the 1950s. In the 1970s, gynecologists began using surgical mesh products designed for hernia repair for abdominal repair to surgically repair prolapsed organs. In the 1990s, gynecologists began using this surgical mesh for the surgical treatment of "POP" and "SUI". Manufacturers, including Defendants Coloplast and BSC, began to modify the mesh used in hernia repair to be used as products specifically intended to correct POP and SUI.

15.     The Pelvic Mesh Products are targeted for women who suffer from POP and SUI as a result of the weakening or damage caused to the walls of the vagina. These products are specifically promoted to physicians and patients as an innovative, minimally invasive procedure with minimal local tissue reactions, minimal tissue trauma and minimal pain while correcting vaginal prolapse, SUI, POP, and/or rectocele.

16.     These Pelvic Mesh Products contain polypropylene. Despite claims that this material is inert, the scientific evidence shows that this mesh material is biologically incompatible with human tissue and promotes an immune response in a large subset of the population receiving these Pelvic Mesh Products. This immune response promotes degradation of the polypropylene, as well as the pelvic tissue, and can contribute to the formation of severe adverse reactions to the mesh.

17.     By 2008, the FDA became aware of potential safety issues with urogynecologic surgical mesh products through postmarket surveillance of the MAUDE database for medical device reports (MDRs), concerns raised by clinical community and citizens, and the published literature.

18.     On October 20, 2008, the Food and Drug Administration ("FDA") issued a Public Health Notification that described over 1,000 complaints (otherwise known as "adverse events") that had been reported over a three-year period relating to the implant of mesh for repair of POP and SUI. The information contained in the FDA's Public Health Notification of October 2008 was known or knowable to Defendants BSC and Coloplast and was not disclosed in oral or written communications, direct to consumer advertising in the form of patient brochures, instructions for use, or labeling.

19.     In a December 2011 Joint Committee Opinion, the American College of Obstetricians and Gynecologists ("ACOG") and the American Urogynecologic Society ("AUGS") also identified physical and mechanical changes to the mesh inside the body as a serious complication associated with vaginal mesh, stating:

> There are increasing reports of vaginal pain associated with changes that can occur with mesh (contraction, retraction, or shrinkage) that result in taut sections of mesh . . . Some of

these women will require surgical intervention to correct the condition, and some of the

pain appears to be intractable.

Defendants BSC and Coloplast knew or should have known about the risks and complications of

mesh for POP and SUI identified in the ACOG/AUGS Joint Committee Opinion.

20.    The Pelvic Mesh Products implanted into Melissa were in the same or substantially

similar condition as they were when they left the possession of Defendants BSC and   Coloplast

and in the condition directed by and expected by the Defendants BSC and Coloplast. Melissa and

her physicians foreseeably used and implanted the Pelvic Mesh Products and did not misuse or

alter the Pelvic Mesh Product in an unforeseeable manner.

21.    The injuries, conditions, and complications suffered by women who have been implanted

with the Defendant BSC and Coloplast's Pelvic Mesh Products include, but are not limited to,

mesh erosion, mesh contraction, infection, fistula, inflammation, scar tissue, organ perforation,

dyspareunia (pain during sexual intercourse), inability to engage in sexual relations, urinary

problems, inability to void, blood loss, neuropathic and other acute and chronic nerve damage and

pain, pudendal nerve damage, shortening of the vagina, pelvic floor damage, chronic pelvic pain,

urinary and fecal incontinence, prolapse of organs, and in many cases the women have been forced

to undergo intensive medical treatment, including but not limited to, operations to locate and

remove mesh, operations to attempt to repair pelvic organs, tissue, and nerve damage, the use of

pain control and other medications, injections into various areas of the pelvis, spine, and the

vagina, and operations to remove portions of the female genitalia.

22.    Defendants BSC and Coloplast were under a duty to disclose to Melissa, and her

physicians, the defective nature of the Pelvic Mesh Products including, but not limited to, the

heightened risks of erosion, failure and permanent injury.

6

23.    Defendants BSC and Coloplast had sole access to material facts concerning the defective nature of the Pelvic Mesh Products and their propensity to cause serious and dangerous side effects and hence, cause dangerous injuries and damage to persons who used the Pelvic Mesh Products.

24.    Defendants BSC and Coloplast's concealment and omissions of material fact concerning the safety of the Pelvic Mesh Products were made to cause Melissa, her physicians and healthcare providers to purchase, prescribe, and/or dispense the Pelvic Mesh Products; and/or to mislead them into reliance and caused them to have the Pelvic Mesh Products implanted in the bodies of women.

25.    Defendants BSC and Coloplast knew and had reason to know that the Pelvic Mesh Products could and would cause severe and grievous personal injury to the users of the Pelvic Mesh Products, and that they were inherently dangerous in a manner that exceeded any purported, inaccurate, or otherwise downplayed warnings.

26.    On or about January 17, 2019, Melissa underwent a surgery by Defendant Michael H. Heit, M.D. at Indiana University Hospital, North Hospital, City of Carmel, County of Hamilton, State of Indiana to excise some of the Coloplast Restorelle based upon a suspicion of erosion of the mesh into her vagina as her husband had complained of something sticking him during sexual relations.   On or about April 4, 2019, Melissa had to undergo another surgery by Defendant Michael H. Heit, M.D. at the same hospital to excise some of the BSC Advantage mesh based upon incomplete bladder emptying.

27.     Defendants BSC and Coloplast knew or had reason to know that Melissa and her physicians and other healthcare providers had no way to determine the truth behind their

7

concealment of   material omissions of facts surrounding the use of the Pelvic Mesh Products, as described in detail herein.

28.     Had Plaintiff known the true facts about the dangers and serious health and/or safety risks of the Pelvic Mesh Products she would not have consented to the implant of these products. The Pelvic Mesh Products as designed, manufactured, distributed sold and/or supplied by Defendants BSC and Coloplast were defective as marketed due to inadequate warnings, instructions, labeling and/or inadequate testing in the presence of BSC and Coloplast's knowledge of lack of pelvic health safety.

29.     Pelvic Mesh Products contain collagen and cause hyper-inflammatory responses leading to problems including chronic pain and fibrotic reaction. Pelvic Mesh Products disintegrate after implantation into the female pelvis. The collagen-containing Pelvic Mesh Products cause adverse tissue reactions, and are causally related to infection, as the collagen is a foreign organic material. Cross linked collagen is harsh upon the female pelvic tissues. It hardens in the body.   When Pelvic Mesh Products are inserted in the female body according to the manufacturers' instructions, it creates a non-anatomic condition in the pelvis leading to chronic pain and functional disabilities.

30.     As is known to the Defendant BSC and Coloplast, the risks associated with POP repair are about the same as for SUI repair. However, the data regarding the magnitude and frequency of these known risks of SUI repair are not as developed as the data on POP repair.     By September 2011, there was literature and information developing on SUI repair with mesh indicating that serious complications can occur and that there was a need to further study those risks.

31.     Defendants BSC and Coloplast did not adequately study the extent of risks associated with their Pelvic Mesh Products.   They failed to establish the safety of their Pelvic Mesh Products before selling them.   They also sold Pelvic Mesh Products to fix the medical problems of POP and

SUI that made patients worse after implant of their products.   Further, they did not know how to safely remove their Pelvic Mesh Products from women if women experienced serious complications from their products.

32.     Defendants BSC and Coloplast knew or should have known that the Pelvic Mesh Products unreasonably exposed patients to the risk of serious harm while conferring no benefit over available feasible alternatives. A woman who elects to have her SUI or POP surgically treated has several options. SUI can be corrected through traditional abdominal surgery using sutures to attach the urethra to a ligament in the pelvis (known as the "Burch procedure"). SUI can also be surgically addressed using synthetic materials placed under the urethra to provide support. POP can be corrected through abdominal or transvaginal surgery and using biologic, composite, or synthetic materials.

33.     Scientific evidence shows that polypropolene as implanted in Plaintiff is biologically incompatible with human tissue. When used as a woven or knitted alloplastic textile prosthetic mesh for pelvic floor repair, polypropylene and other surgical polymers promote a severe foreign body reaction and chronic inflammatory response in a large subset of the population implanted with Pelvic Mesh Products.   This "host defense response" by a woman's pelvic tissues promotes degradation of the polypropylene mesh and the pelvic tissue. It causes: chronic inflammation of the pelvic tissue; shrinkage or contraction of the mesh leading to nerve entrapment, further inflammation, chronic infectious response and chronic pain; new-onset painful sexual relations, significant urinary dysfunction, vaginal shortening and anatomic deformation. It can contribute to the formation of severe adverse reactions to the polypropylene mesh.

34.     Contrary to Defendant BSC and Coloplast's assertions that its Pelvic Mesh Products

minimize inflammatory response, Pelvic Mesh Products increase inflammatory response.

35. Contrary to the assertions by BSC and Coloplast that Pelvic Mesh Products are resistant to significant inflammation, infection or erosion:

    A.    Complications from mesh placement for POP include among other adverse events: acute and chronic infection, tissue contraction due to mesh shrinkage, erosion of the mesh into adjacent structures, and dyspareunia;

    B.    Erosion can be defined as the mesh wearing, or slowly grinding through the vaginal wall.   This is a serious complication. Meshes shrink in vivo leading to increased stiffness, pain and poor restoration of the normal properties of the vagina;

    C.    The Pelvic Mesh Products lack larger pores within polypropylene mesh materials, which would have allowed macrophage and leukocyte migration that in turn would likely reduce infection.

36. Pelvic Mesh Products were unreasonably susceptible to: degradation and fragmentation inside the body; shrinkage or contraction inside the body; intense foreign body reaction; chronic inflammatory response; chronic wound healing; chronic infections in and around the mesh fibers; and nerve entrapment in the collagen scar formation. Defendants BSC and Coloplast knew or should have known of these serious risks. Therefore, they should have warned physicians and patients regarding these risks to the extent they were known or knowable.

37. Defendants BSC and Coloplast omitted and downplayed the risks, dangers, defects, and disadvantages of Pelvic Mesh Products, and advertised, promoted, marketed, sold and distributed the Pelvic Mesh Products as a safe medical device when Defendants BSC and Coloplast knew or should have known Pelvic Mesh Products: were not safe for its intended purposes; would cause, and did cause, serious medical problems, and in some patients, including Melissa, catastrophic

10

injuries. Further, while some of the problems associated with the Pelvic Mesh Products were made known to physicians, the likelihood and severity of these problems were not disclosed and were hidden from physicians.

38.     Contrary to Defendant BSC and Coloplast's representations and marketing to the medical community and to the patients themselves, Pelvic Mesh Products had high rates of failure, injury, and complications, failed to perform as intended, required frequent and often debilitating re- operations, and caused severe and irreversible injuries, conditions, and damage to a significant number of women, including Melissa, making Pelvic Mesh Products defective under the law.

39.     The specific nature of the Pelvic Mesh Products' defects include, but are not limited to, the following:

    A.     The use of polypropylene in Pelvic Mesh Products and the adverse tissue reactions and immune response that result from such material, causing adverse reactions and serious, permanent injuries including, but not limited to, painful recurrent erosions and associated intractable pain;

    B.     The propensity of the mesh design characteristics of Pelvic Mesh Products for plastic deformation when subjected to tension both during implantation and once implanted inside the body which causes the mesh, or portions thereof, to be encapsulated in a rigid scar plate which leads to nerve entrapment, bacterial entrapment, tissue destruction, enhanced inflammatory and fibrotic response and chronic pain;

    C.     The propensity of Pelvic Mesh Products to become rigid and inflexible;

D.      The propensity of Pelvic Mesh Products for degradation or fragmentation over time, which causes an increased surface area that leads to enhanced chronic inflammatory and fibrotic reaction, causes a "barbed wire" or "saw blade" effect by the fragmented surface "sawing" through the tissue, leads to bacteria harboring in the fragmented, peeled and split fiber surface, which in turn leads to chronic infections at the mesh surface, and results in continuing injury over time;

E.      The hyper-inflammatory responses to collagen leading to problems including chronic inflammatory response, chronic pain and fibrotic reaction as well as infections and other serious adverse events;

F.      The propensity of Pelvic Mesh Products to disintegrate after implantation in the female pelvis, causing pain and other adverse reactions;

G.      The harshness of Pelvic Mesh Products upon the female pelvic tissue, and the hardening of the product in the body; and

H.      The inability of surgeons to effectively treat many of these conditions due to the integration of the mesh into the pelvic tissue and thus the inability to safely remove or excise the mesh once a complication occurs;

40.     Defendants BSC and Coloplast under reported information about the propensity of Pelvic Mesh Products to fail and cause injury and complications, and have made unfounded representations regarding the efficacy and safety of Pelvic Mesh Products through various means and media.

41.     Defendants BSC and Coloplast failed to perform proper and adequate testing and research in order to determine and evaluate the nature, magnitude and frequency of the risks attendant to the Pelvic Mesh Products.

42.     Defendants BSC and Coloplast failed to design and establish a safe, effective procedure for removal of Pelvic Mesh Products, or to determine if a safe, effective procedure for removal of Pelvic Mesh Products exists.

43.     Feasible, suitable and safer alternatives to Pelvic Mesh Products have existed at all times relevant that do not present the same frequency or severity of risks as do Pelvic Mesh Products. Pelvic Mesh Products were at all times utilized and implanted in a manner foreseeable to Defendants BSC and Coloplast, as they generated the instructions for use, created the procedures for implanting the devices, and trained physicians who implanted the medical devices.

44.     Defendants BSC and Coloplast knowingly provided incomplete and insufficient training and information to physicians regarding the use of the Pelvic Mesh Products and the aftercare of patients implanted with the Pelvic Mesh Products.

45.     The injuries, conditions, and complications suffered by numerous women around the world who have been implanted with Pelvic Mesh Products include, but are not limited to, erosion, mesh contraction, infection, fistula, inflammation, scar tissue, organ perforation, dyspareunia (pain during sexual intercourse), urinary dysfunction, blood loss, neuropathic and other acute and chronic nerve damage and pain, pudendal nerve damage, pelvic floor damage, and chronic pelvic pain. As a result of these life-altering and, in some cases, permanent injuries.   Melissa has suffered severe emotional pain and injury and has suffered and will suffer apprehension of increased risk for injuries, infections, pain, mental anguish, discharge, and multiple corrective surgeries as a result of Pelvic Mesh Products.

46.     In many cases, women including Melissa have been forced to undergo extensive medical treatment including, but not limited to, operations to locate and remove mesh.

13

47.     Pelvic Mesh Products as designed, manufactured, distributed, sold and/or supplied by Defendants BSC and Coloplast were defective as marketed due to inadequate warnings, instructions, labeling and/or inadequate testing in the presence of Defendant Coloplast's knowledge of lack of safety.

## CAUSES OF ACTION

### COUNT I
### PRODUCTS LIABILITY -DESIGN DEFECT

48.     Plaintiff incorporates by reference, as if fully set forth herein, each and every allegation contained in the preceding paragraphs of this Complaint and states the following under the Indiana Product Liability Act, Ind. Code §§ 34-20-1-1, et seq.

49.     Defendant Coloplast defectively designed Restorelle as a pelvic mesh implant to repair POP.   Defendant Coloplast had a duty to women, including Melissa, to use reasonable care in designing Restorelle.

50.     Defendant Coloplast transferred and sold Restorelle to physicians using Restorelle when its condition is not one that would be anticipated by a reasonable expected user of the product, here pelvic floor surgeons, including Melissa's surgeon who implanted   Restorelle.   Further, the defective design caused it to be unreasonably dangerous in that it exposed Melissa to a risk of physical harm beyond that contemplated by an ordinary consumer, in this case beyond that contemplated by Melissa and her implanting surgeon, when the implanting surgeon used it in a reasonably expected way.

51.     Defendant Coloplast was negligent in failing to use reasonable care as described herein in designing Restorelle and selling it.   Defendant Coloplast breached its aforementioned duty by:

14

A.   Failing to design Restorelle so as to avoid an unreasonable risk of harm to women in whom Restorelle was implanted, including Melissa;

B.   Failing to manufacture Restorelle so as to avoid an unreasonable risk of harm to women in whom Restorelle was implanted, including Melissa;

C.   Failing to use reasonable care in the testing of Restorelle as to avoid an unreasonable risk of harm to women in whom Restorelle was implanted, including Melissa;

D.   Failing to use reasonable care in instructing and/or warning health care providers and the public as set forth herein of risks associated with Restorelle, so as to avoid unreasonable risk of harm to women in whom Restorelle was implanted, including Melissa;

E.   Failing to use reasonable care in marketing and promoting Restorelle, so as to avoid unreasonable risk of harm to women in whom Restorelle was implanted, including Melissa; and

F.   Otherwise negligently or carelessly designing, manufacturing, marketing, distributing, warning, labeling studying, testing or selling Restorelle.

52.   The reasons that Defendant Coloplast's negligence caused the Restorelle to be unreasonably dangerous and defective in design include, but are not limited to:

A.   the use of polypropylene material in Restorelle and the immune reaction that results from such material, causing adverse reactions and injuries;

B.   biomechanical issues with the design of Restorelle, including, but not limited to, the propensity of Restorelle to contract or shrink inside the body, that in turn causes

15

surrounding tissue to be inflamed, become fibrotic, and contract, resulting in injury;

C.   the propensity of Restorelle for migration or to gradually elongate and deform when subject to prolonged tension inside the body;

D.   the inelasticity of Restorelle, causing it to be improperly mated to the delicate and sensitive areas of the pelvis where it is implanted, and causing pain upon normal daily activities that involve movement in the pelvis (e.g., intercourse, defecation, walking);

E.   the propensity of Restorelle to degrade or fragment over time, which causes a chronic inflammatory and fibrotic reaction, and results in continuing injury over time;

F.   the propensity of Restorelle to cause long standing inflammatory response altering the effective porosity of the mesh resulting in poor outcomes including bridging fibrosis, compromise of tissues in contact with or surrounding the mesh, erosion, nerve damage and resulting neuromas;

G.   the creation of a non-anatomic condition in the pelvis leading to chronic pain and functional disabilities when the mesh is implanting according to the manufacturers' instructions.

53.   As a direct and proximate result of  Coloplast selling Restorelle, a defectively designed product for implant, Melissa   suffered and continues to suffer injury and damage, including, but not limited to, past, present, and future physical and mental pain and suffering, emotional distress, her ability to function as a whole person, aggravation of preexisting injury or

16

condition, disfigurement, and past, present, and future medical, hospital, monitoring, rehabilitative, and pharmaceutical expenses, and lost income and earning capacity.

## COUNT II
## PRODUCTS LIABILITY- FAILURE TO WARN

54.     Plaintiff incorporates by reference, as if fully set forth herein, each and every allegation contained in the preceding paragraphs of this Complaint and states the following under the Indiana Product Liability Act, Ind. Code §§ 34-20-1-1, et seq.

55.     Defendant Coloplast failed to adequately warn Melissa and her implanting physician about the risks of Restorelle to repair POP.

56.     Defendant Coloplast had a duty to adequately warn women who elected to repair POP with Restorelle of the risks of Restorelle, including Melissa, and to adequately warn physicians who implanted Restorelle of the risks of doing so.

57.     Defendant Coloplast failed to use reasonable care in warning pelvic floor surgeons, including Melissa's implanting physician, about the dangers of Restorelle. Defendant Coloplast knew or should have known or should have discovered these dangers. By failing to adequately warn of the dangers of Restorelle, Defendant Coloplast caused Restorelle to be unreasonably dangerous in that it exposed Melissa to a risk of physical harm beyond that contemplated by an ordinary consumer, in this case beyond that contemplated by Melissa and her implanting surgeon, when the implanting surgeon used it in a reasonably expected way.

58.     Defendant Coloplast failed to properly package or label Restorelle with reasonable warnings about the danger of Restorelle when Coloplast, by exercising reasonable diligence, could have made those warnings available to the user or consumer.

59.     Defendant Coloplast's Restorelle was also defective due to Coloplast's failure to

adequately warn or instruct women like Melissa and their health care providers, including Melissa's implanting surgeon, of subjects, including but not limited to, the following:

A.   Restorelle's propensity to contract, retract, and/or shrink inside the body;

B.   Restorelle's propensity for degradation, fragmentation and/or migration;

C.   Restorelle's inelasticity preventing proper mating with the pelvic floor and vaginal region;

D.   The frequency and manner of  mesh erosion;

E.   The risk of chronic inflammation resulting from Restorelle;

F.   The risk of chronic infections resulting from Restorelle;

G.   The risk of permanent vaginal or pelvic scarring as a result of Restorelle;

H.   The risk of de novo urinary dysfunction;

I.   The risk of de novo dyspareunia or painful sexual relations;

J.   The risk of recurrent, intractable pelvic pain and other pain resulting from Restorelle;

K.   The need for corrective or revision surgery to adjust or remove Restorelle, which in some cases is neither feasible nor possible;

L.   The severity of complications that could arise as a result of implantation of Restorelle;

M.   The hazards associated with Restorelle;

N.   Restorelle' defects described herein;

O.   Treatment of POP with Restorelle is no more effective than feasible, available and safer alternatives;

P.      Treatment of POP with Restorelle exposes patients to greater risk than feasible, available and safer alternatives;

Q.      Treatment of POP with Restorelle makes future surgical repair more difficult than feasible, available and safer alternatives;

R.      Use of Restorelle puts the patient at greater risk of requiring additional surgery than feasible, available and safer alternatives;

S.      Removal of Restorelle due to complications may involve multiple surgeries and may significantly impair the patient's quality of life; and

T.      Complete removal of Restorelle may not be possible and may not result in complete resolution of the complications, including pain;

U.      Failed to establish the safety of Restorelle before selling it; and

V.      Restorelle was sold to repair POP but made many patients worse after its implant.

60.    As a direct and proximate result of Coloplast failing to adequate warn of the risks of Restorelle, Melissa   suffered and continues to suffer injury and damage, including, but not limited to, past, present, and future physical and mental pain and suffering, emotional distress, her ability to function as a whole person, aggravation of preexisting injury or condition, disfigurement, and past, present, and future medical, hospital, monitoring, rehabilitative, and pharmaceutical expenses, and lost income and earning capacity.

## COUNT III
## PRODUCTS LIABILITY -DESIGN DEFECT

61.    Plaintiff incorporates by reference, as if fully set forth herein, each and every allegation contained in the preceding paragraphs of this Complaint and states the following under the Indiana Product Liability Act, Ind. Code §§ 34-20-1-1, et seq.

62.     Defendant BSC defectively designed Advantage as a pelvic mesh implant to correct SUI. Defendant BSC had a duty to women, including Melissa, to use reasonable care in designing Advantage.

63.     Defendant BSC transferred and sold Advantage to physicians using Advantage when its condition is not one that would be anticipated by a reasonable expected user of the product, here pelvic floor surgeons including Melissa's surgeon who implanted the Advantage.   Further, the defective design caused it to be unreasonably dangerous in that it exposed Melissa to a risk of physical harm beyond that contemplated by an ordinary consumer, in this case beyond that contemplated by Melissa and her implanting surgeon, when the implanting surgeon used it in a reasonably expected way.

64.     Defendant BSC was negligent in failing to use reasonable care as described herein in designing Advantage and selling it.   Defendant BSC breached its aforementioned duty by:

    A.     Failing to design Advantage so as to avoid an unreasonable risk of harm to women in whom Advantage was implanted, including Melissa;

    B.     Failing to manufacture Advantage so as to avoid an unreasonable risk of harm to women in whom Advantage was implanted, including Melissa;

    C.     Failing to use reasonable care in the testing of Advantage so as to avoid an unreasonable risk of harm to women in whom Advantage was implanted, including Melissa;

    D.     Failing to use reasonable care in training its employees and health care providers related to the use of Advantage so as to avoid unreasonable risk of harm to women in whom Advantage were implanted, including Melissa;

E.  Failing to use reasonable care in instructing and/or warning health care providers and the public as set forth herein of risks associated with Advantage, so as to avoid unreasonable risk of harm to women in whom Advantage was implanted, including Melissa;

F.  Failing to use reasonable care in marketing and promoting Advantage, so as to avoid unreasonable risk of harm to women in whom Advantage was implanted, including Melissa; and

G.  Otherwise negligently or carelessly designing, manufacturing, marketing, distributing, warning, labeling studying, testing or selling the Advantage.

65.  The reasons that Defendant BSC's negligence caused the Advantage to be unreasonably dangerous and defective in design include, but are not limited to:

A.  the use of polypropylene material in Advantage and the immune reaction that results from such material, causing adverse reactions and injuries;

B.  biomechanical issues with the design of Advantage, including, but not limited to, the propensity of Advantage to contract or shrink inside the body, that in turn causes surrounding tissue to be inflamed, become fibrotic, and contract, resulting in injury;

C.  the propensity of Advantage for migration or to gradually elongate and deform when subject to prolonged tension inside the body;

D.  the inelasticity of Advantage, causing it to be improperly mated to the delicate and sensitive areas of the pelvis where it is implanted, and causing pain upon normal

21

daily activities that involve movement in the pelvis (e.g., intercourse, defecation, walking);

E.   the propensity of Advantage to degrade or fragment over time, which causes a chronic inflammatory and fibrotic reaction, and results in continuing injury over time;

F.   the propensity of Advantage to cause long standing inflammatory response altering the effective porosity of the mesh resulting in poor outcomes including bridging fibrosis, compromise of tissues in contact with or surrounding the mesh, erosion, nerve damage and resulting neuromas; and

G.   the creation of a non-anatomic condition in the pelvis leading to chronic pain and functional disabilities when the mesh is implanting according to the manufacturers' instructions.

66.   As a direct and proximate result of BSC selling Advantage, a defectively designed product for implant, Melissa suffered and continues to suffer injury and damage, including, but not limited to, past, present, and future physical and mental pain and suffering, emotional distress, her ability to function as a whole person, aggravation of preexisting injury or condition, disfigurement, and past, present, and future medical, hospital, monitoring, rehabilitative, and pharmaceutical expenses, and lost income and earning capacity.

## COUNT IV
## PRODUCTS LIABILITY- FAILURE TO WARN

67.   Plaintiff incorporates by reference, as if fully set forth herein, each and every allegation contained in the preceding paragraphs of this Complaint and states the following under the Indiana Product Liability Act, Ind. Code §§ 34-20-1-1, et seq.

68.     Defendant BSC failed to adequately warn Melissa and her implanting physician about the risks of Advantage to correct SUI.   Defendant BSC had a duty to adequately warn women, including Melissa, who elected to correct SUI with Advantage of the risks of Advantage and to adequately warn physicians who implanted Advantage of the risks of doing so.

69.     Defendant BSC failed to use reasonable care in warning pelvic floor surgeons, including Melissa's implanting physician, about the dangers of Advantage. Defendant BSC knew or should have known or should have discovered these dangers. By failing to adequately warn of the dangers of Advantage, Defendant BSC caused Advantage to be unreasonably dangerous in that it exposed Melissa to a risk of physical harm beyond that contemplated by an ordinary consumer, in this case beyond that contemplated by Melissa and her implanting surgeon, when the implanting surgeon used it in a reasonably expected way.

70.     Defendant BSC failed to properly package or label Advantage with reasonable warnings about the danger of Advantage when BSC, by exercising reasonable diligence, could have made those warnings available to the user or consumer.

71.     Defendant BSC's Advantage was also defective due to BSC's failure to adequately warn or instruct women like Melissa and their health care providers, including Melissa's implanting surgeon, of subjects, including but not limited to, the following:

    A.     Advantage's propensity to contract, retract, and/or shrink inside the body;

    B.     Advantage's propensity for degradation, fragmentation and/or migration;

    C.     Advantage's inelasticity preventing proper mating with the pelvic floor and vaginal region;

    D.     The frequency and manner of mesh erosion;

E.      The risk of chronic inflammation resulting from Advantage;

F.      The risk of chronic infections resulting from Advantage;

G.      The risk of permanent vaginal or pelvic scarring as a result of Advantage;

H.      The risk of de novo urinary dysfunction;

I.      The risk of de novo dyspareunia or painful sexual relations;

J.      The risk of recurrent, intractable pelvic pain and other pain resulting from Advantage;

K.      The need for corrective or revision surgery to adjust or remove Advantage, which in some cases is neither feasible nor possible;

L.      The severity of complications that could arise as a result of implantation of Advantage;

M.      The hazards associated with Advantage;

N.      Advantage' defects described herein;

O.      Treatment of SUI with Advantage is no more effective than feasible, available and safer alternatives;

P.      Treatment of SUI with Advantage exposes patients to greater risk than feasible, available and safer alternatives;

Q.      Treatment of SUI with Advantage makes future surgical repair more difficult than feasible, available and safer alternatives;

R.      Use of Advantage puts the patient at greater risk of requiring additional surgery than feasible, available and safer alternatives;

S.      Removal of Advantage due to complications may involve multiple surgeries and may significantly impair the patient's quality of life;

24

T.     Complete removal of Advantage may not be possible and may not result in complete resolution of the complications, including pain;

U.     Failed to establish the safety of Advantage before selling it; and

V.     Advantage was sold to fix the medical problems of SUI but made many patients worse after its implant.

71.     As a direct and proximate result of BSC failing to adequate warn of the risks of Advantage, Melissa   suffered and continues to suffer injury and damage, including, but not limited to, past, present, and future physical and mental pain and suffering, emotional distress, her ability to function as a whole person, aggravation of preexisting injury or condition, disfigurement, and past, present, and future medical, hospital, monitoring, rehabilitative, and pharmaceutical expenses, and lost income and earning capacity.

## COUNT V
## LOSS OF CONSORTIUM

72.     Plaintiff, John M. Little, Jr.   ("John") incorporates by reference, as if fully set forth herein, each and every allegation contained in the preceding paragraphs of this Complaint.

73.     At the time of the implant of the Pelvic Mesh Products, alleged above, and continuing to the present, John was and remains the lawful spouse of Melissa and thereby has been entitled to the services, society, companionship and consortium of his wife, all of which he has been deprived as a direct and proximate result of the Pelvic Mesh Products implanted in Melissa.

## COUNT VI
## PERSONAL INJURY

74.     John incorporates by reference, as if fully set forth herein, each and every allegation contained in the preceding paragraphs of this Complaint.

75.     In or around December 2018, John was engaged in sexual intercourse with Melissa when he was injured as a result of one or more of the mesh implants in Melissa had eroded into her vagina.   These mesh products were implanted in Melissa and as a result of the foregoing acts of negligence alleged against Coloplast and BSC, John was physically injured.

76.     As a direct and proximate result of the foregoing alleged acts of negligence by BSC and Coloplast, John suffered and continues to suffer injury and damage, including, but not limited to, past, present, and future physical and mental pain and suffering, emotional distress, and disfigurement.

## **PRAYER FOR RELIEF AGAINST DEFENDANTS COLOPLAST AND BSC**

WHEREFORE, Plaintiffs Melissa R. Little and John M. Little, Jr. request judgment against Defendants Coloplast and BSC, individually, jointly, severally, and in the alternative, including:

## **A.     Punitive Damages**

77.     Melissa incorporates by reference, as if fully set forth herein, each and every allegation contained in the preceding paragraphs of this Complaint and states the following under the Indiana Product Liability Act, Ind. Code §§ 34-20-1-1, et seq.

78.     Defendants BSC and Coloplast (hereinafter "Defendants") sold Restorelle and Advantage (herinafter "Products") to the healthcare providers of the Melissa and other healthcare providers in Indiana and throughout the United States without doing adequate testing to ensure that the Products were reasonably safe for implantation in the female pelvic area.

79.     Defendants sold the Products to Melissa, health care providers and other health care providers in Indiana and throughout the United States in spite of their knowledge that the Products can shrink, disintegrate and/or degrade inside the body, and cause the other problems heretofore

26

set forth in this complaint, thereby causing severe and debilitating injuries suffered by Melissa and numerous other women.

80.     Defendants ignored reports from patients and health care providers throughout the United States and elsewhere of the Products' failures to perform as intended, which lead to the severe and debilitating injuries suffered by Melissa and numerous other women. Rather than doing adequate testing to determine the cause of these injuries, or to rule out the Products' designs or the processes by which the Products are manufactured as the cause of these injuries, Defendants chose instead to continue to market and sell the Products as safe and effective.

81.     Defendants knew the Products were unreasonably dangerous in light of their risks of failure, pain and suffering, loss of life's enjoyment, remedial surgeries and treatments in an effort to cure the conditions proximately related to the use of the Products, as well as other severe and personal injuries which were permanent and lasting in nature.

82.     Defendants withheld material information from the medical community and the public in general, including Melissa, regarding the safety and efficacy of the Products.

83.     Defendants knew and recklessly disregarded the fact that the Products caused debilitating and potentially life altering complications with greater frequency than feasible alternative methods and/or products used to treat pelvic organ prolapse and stress urinary incontinence.

84.     Defendants misstated and misrepresented data and continue to misrepresent data so as to minimize the perceived risk of injuries caused by the Products.

85.     Notwithstanding the foregoing, Defendants continue to aggressively market the Products to consumers, without disclosing the true risks associated with the Products.

86.     Defendants knew of the Products' defective and unreasonably dangerous nature, but

continued to mislead physicians and patients and to manufacture, market, distribute, and sell the Products so as to maximize sales and profits at the expense of the health and safety of the public, including Melissa.

87.     Defendants continue to conceal and/or fail to disclose to the public, including Melissa, the serious complications associated with the use of the Products to ensure continued and increased sales of the Products.

88.     Indiana law applies to this claim for Punitive Damages.   Defendants' conduct as described herein shows they acted with malice, fraud, gross negligence, and oppressiveness, which was not the result of mistake of fact or law, honest error or judgment, overzealousness, mere negligence, or other human failing, thereby justifying an award of punitive damages.

**B.      Compensatory Damages**

89.     Awarding actual damages to Plaintiff incidental to leaving implanted the products at issue in an amount to be determined at trial;

90.     Awarding the past and future costs of treatment for Plaintiff's injuries caused by the Products in an amount to be determined at trial;

91.     Awarding damages for Plaintiff's past and future physical pain and suffering in an amount to be determined at trial;

92.     Awarding damages for Plaintiff's mental and emotional anguish in an amount to be determined at trial;

93.     Plaintiff's ability to function as a whole person in an amount to be determined at trial;

94.     Aggravation of preexisting injury or condition in an amount to be determined at trial;

95.     Disfigurement in an amount to be determined at trial;

28

96.    Awarding damages for Plaintiffs loss of earnings and future earning capacity;

97.    Awarding injunctive relief, including disgorgement of all profits made from and monies

from and monies paid for the Products at issue in an amount to be determined at trial;

98.    Awarding the costs and expenses of this litigation incurred by Melissa;

99.    Awarding reasonable attorneys' fees and costs to Melissa as provided by law;

100.   John M. Little's loss of consortium in an amount to be determined at trial; and

101.   Any other further relief in law or equity that this Court deems appropriate, necessary, just, and proper.

## COUNT VII
## MALPRACTICE

NOW COMES, Melissa, by counsel, for her claim for relief against the Michael H. Heit,

M.D. and alleges and states as follows:

102.   Melissa expressly makes a part of this Count, paragraphs 1 and 6 of this Complaint.

103.   Defendant Heit was a licensed medical doctor in the State of Indiana and held himself out

to possess that degree of skill, ability, and learning, common to medical personnel in said

community.

104.   Upon information and belief, Defendant Heit did business in the County of Marion, in the

State of Indiana.

105.    Plaintiff retained the services of Defendant Heit to treat her for SUI, a medical condition

for which Defendant Heit implanted Advantage in Plaintiff.

106.   Upon information and belief, prior to June 15, 2017, Defendant Heit knew, or should

have known, Advantage had high failure, injury, and complication rates, failed to perform as

intended, required frequent and often debilitating additional surgeries, and has caused severe and

irreversible injuries, conditions, and damage to a significant number of women.

107.    Prior to June 15, 2017, Melissa presented to Defendant Heit for consultation regarding her SUI. During this consultation, Defendant Heit recommended implantation of a polypropolene mesh, the Advantage, but failed to fully disclose to Melissa all risks he knew, or should have known, were associated with implantation.

108.    Upon information and belief Defendant Heit recommended the Advantage to Melissa as appropriate and safe for the treatment of SUI. Consequently, Melissa consented to the implantation of the Advantage.

109.    On or about June 15, 2017, Defendant Heit, M.D., at IUH in City of Indianapolis, County of Marion, State of Indiana, implanted Melissa with an Advantage mid-urethral sling with the intention of treating her for SUI, the use for which BSC marketed and sold the Advantage.

110.    On or about April 4, 2019, a revision surgery was performed on Melissa, which surgically explanted some of the Advantage.

111.    Defendant Heit carelessly and negligently treated, operated on, and cared for Melissa, and so negligently failed to conform to the standards of care required of him as a medical practitioner, surgeon, and physician, and that by reason thereof, Melissa was caused to and did suffer irreparable, serious personal injuries and damages as described herein.

112.    More specifically, the injuries and damages sustained by Melissa were proximately caused by the following acts and omissions of negligence of Defendant Heit:

     A.     Failed to properly give an informed consent to Melissa for the implant of Advantage in that he failed to inform her of the likelihood of the risks and complications he knew or should have known about when implanting Advantage in a patient like Melissa;

30

    B.     Failed to select and perform the proper medical procedure for treating Melissa's SUI;

    C.     Implanted Advantage in Melissa despite the fact that mid-uretheral slings made of polypropolene have high failure, injury, and complication rates, fail to perform as intended, require frequent and often-debilitating additional surgeries, and have caused severe and irreversible injuries, conditions, and damage to a significant number of women;

    D.     Failed to properly diagnose, treat, and perform surgeries upon Melissa.

113.   As a direct result of said negligence of Defendant Heit in implanting Melissa with the Advantage, Melissa suffered and will continue to suffer serious bodily injuries, including pain, continued incontinence, scarring, infection, and bleeding.

114.   Melissa declares that she seeks an amount in damages not greater than fifteen thousand dollars ($15,000) from Defendant Heit.

WHEREFORE, Melissa prays for judgment against Michael H. Heit, M.D. in an amount not greater than fifteen thousand dollars ($15,000).

Respectfully Submitted,

By: _____
Richard A. Cook, #3996-45
Attorney for Plaintiff

**DEMAND FOR JURY TRIAL**

The Plaintiffs Melissa and John, by counsel, demand trial by jury on all issues so triable in this civil action.

YOSHA, COOK & TISCH

By: _____

Richard A. Cook

Richard A. Cook, #3996-45
YOSHA, COOK & TISCH
9102 N. Meridian St., Ste. 535
Indianapolis, IN 46260
(317)334-9200
Email: rcook@yoshalaw.com

Counsel for the Plaintiffs, Melissa R. Little and
John M. Little, Jr.

32